# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| RICHARD SCHLUETER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 50024 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| IMHOTEP CARTER, M.D., ARTHUR FUNK, | ) | |
| M.D., AVA D. VALDEZ, P.A., BESSIE | ) | |
| DOMINGUEZ, M.D., JILL WAHL, M.D., and | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Richard Schlueter, an inmate at Dixon Correctional Center ("Dixon"), filed this lawsuit under 42 U.S.C. § 1983 alleging deliberate indifference to his medical needs. Although Schlueter originally named a host of prison officials, medical professionals, and institutions as defendants, only six defendants remain: Dr. Imhotep Carter, Dr. Arthur Funk, Dr. Bessie Dominguez, Dr. Jill Wahl, Physician's Assistant ("PA") Ava Valdez (collectively, the "Individual Defendants"), and Wexford Health Sources, Inc. ("Wexford"). In the operative complaint, Schlueter alleges that Defendants were deliberately indifferent to his serious medical needs (Count I) and his future health (Count II), and that Wexford maintains an unconstitutional policy, procedure, or practice of intentionally delaying or refusing care to inmates (Count III). Defendants now seek summary judgment on all of Schlueter's claims.

Schlueter concedes that his deliberate indifference claims against Dr. Carter are time-barred, and no reasonable jury could conclude that the other Individual Defendants (Dr. Funk, Dr. Dominguez, Dr. Wahl, and PA Valdez) were deliberately indifferent to Schlueter's current medical needs or his future health. Schlueter also has not shown that a reasonable jury could

find that Wexford maintains an unconstitutional policy, procedure, or practice.  The Court therefore grants Defendants' motion for summary judgment [195].

## BACKGROUND[1]

### I.      Factual Background

Schlueter has been incarcerated at Dixon since 2004.  Wexford is a private corporation that provides medical care and treatment to inmates at various correctional centers throughout Illinois, including Dixon, pursuant to a contract with the State of Illinois.  Doc. 197 at 2 (Undisputed Statement of Fact ("USOF") No. 7); *Diaz v. Chandler*, No. 14 C 50047, 2016 WL 1073103, at *3 (N.D. Ill. Mar. 18, 2016).  Defendants served in various roles at Wexford.  Dr. Funk has operated as Wexford's Regional Medical Director for the northern region of Illinois, which includes Dixon, since 2005.  Doc. 197 at 2 (USOF No. 6); *Stewart v. Wexford Health Sources, Inc.*, No. 12 C 50273, 2019 WL 4279248, at *2 (N.D. Ill. Sept. 10, 2019).  Dr. Carter worked at Dixon as the site's Medical Director from January 1, 2010 through July 24, 2011.  PA Valdez worked for Wexford at Dixon as a physician's assistant.  Dr. Dominguez worked for

---

[1] Unless otherwise noted, the Court derives the facts in the background section from the parties' Joint Statement of Undisputed Material Facts; Schlueter's Supplemental Statement of Material Facts; Defendants' objections and responses to this Statement; and the evidence cited by the parties as support for their factual statements.  For ease of reading, the Court generally will not quote passages from the parties' statements of fact.  The Court takes all facts in the light most favorable to Schlueter.

That said, neither Schlueter nor Defendants complied with the Court's summary judgment procedures. Schlueter improperly included undisputed facts in his separate statement of additional facts.  *See* Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice, https://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA== (last visited, as were all websites cited in this opinion, on Aug. 10, 2020) ("The parties may not file . . . separate statements of undisputed facts.").  Defendants, for their part, improperly responded to many of Schlueter's additional facts with argumentative answers and objections.  Responses of this type do nothing to help the Court "focus on the facts that are actually in dispute."  *See Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711 (7th Cir. 2015); *see also Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 716 (N.D. Ill. 2016) ("argumentative and immaterial assertions" in response to statements of fact did not comply with Local Rule 56.1).  Nonetheless, the Court has overlooked these violations in the interest of resolving the parties' arguments on their merits.

Wexford at Dixon as a staff physician. Dr. Wahl worked as a traveling medical director for Wexford.

Before proceeding farther, the Court pauses to briefly discuss some relevant medical background. The heart of an adult at rest normally beats between 60 and 100 times per minute. *Bradycardia – Symptoms and causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474 (hereinafter, "*Bradycardia*"). Bradycardia is a slower-than-normal heart rate (fewer than 60 beats per minute). *Id.* Symptoms of bradycardia may include, among other things, near-fainting or fainting, dizziness or lightheadedness, shortness of breath, and fatigue. *Id.* In contrast, tachycardia denotes a faster-than-normal heart rate (more than 100 beats per minute) "due to conditions unrelated to normal physiological stress." *Tachycardia – Symptoms and causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/tachycardia/symptoms-causes/syc-20355127 (hereinafter, "*Tachycardia*"). Symptoms of tachycardia include some of the same symptoms of bradycardia, such as shortness of breath, lightheadedness, and fainting. *Id.* The causes of bradycardia and tachycardia can vary, but relevant here, sinus bradycardia and sinus tachycardia refer to situations where the heart's sinus node, which normally controls heart rhythm "by producing electrical impulses that initiate each heartbeat," causes the decreased or increased heart rate, respectively. *See Bradycardia*; *Tachycardia*; Definition of "sinus tachycardia," *Dorland's Medical Dictionary*, https://www.dorlands.com; *Sinus Bradycardia*, Cedars-Sinai, https://www.cedars-sinai.org/health-library/diseases-and-conditions/s/sinus-bradycardia.html.

In or around 2000, doctors diagnosed Schlueter with bradycardia. In 2008 or 2009, Schlueter began experiencing dizzy spells and episodes of syncope (fainting or passing out). Doc. 197 at 3 (USOF No. 10); *see Syncope (Fainting)*, Johns Hopkins Medicine,

https://www.hopkinsmedicine.org/health/conditions-and-diseases/syncope-fainting (hereinafter, "*Syncope*").

Schlueter first saw PA Valdez on or about January 22, 2010, when he presented complaining of weight loss, fatigue, and slow heart rate. To investigate the cause of Schlueter's reported fatigue, PA Valdez ordered a complete blood count, a metabolic panel, an antinuclear antibody test, and a thyroid functioning test. Although Schlueter's heart rate at the visit was normal (72 beats per minute), PA Valdez also ordered an electrocardiogram ("EKG") in response to Schlueter's report of a slow heart rate. At a follow-up appointment with PA Valdez on February 11, Schlueter reported that he was still experiencing dizziness and a slow resting heart rate. Schlueter's vital signs were stable and his heart rate was 64 beats per minute. PA Valdez assessed Schlueter as having bradycardia and planned to discuss his case with the prison's medical director for further treatment of Schlueter's complaints regarding dizziness and slow heart rate. When Schlueter next saw PA Valdez on March 8, he reported that he had been passing out. In light of Schlueter's ongoing complaints of bradycardia, PA Valdez ordered a cardiology referral.

Schlueter saw Dr. Carter a few days later, on March 12. Schlueter reported a decreased heart rate and recurrent syncopal episodes, and he requested a Holter monitor.[2] Schlueter's heart rate was 80 beats per minute at the time. Due to Schlueter's reported syncopal episodes and his request for a Holter monitor, Dr. Carter referred Schlueter to see a cardiologist at the University of Illinois at Chicago ("UIC"). On March 16, Wexford approved Dr. Carter's referral.

Schlueter thereafter saw Dr. George Kondos at UIC's cardiology clinic on May 3. At this visit, Schlueter's blood pressure was elevated (140 over 94) and his pulse was bradycardic (50

---

[2] A Holter monitor is a small wearable device that continuously monitors an individual's heart rate. Doc. 197 at 6 (USOF No. 20); *Holter monitor*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/holter-monitor/about/pac-20385039.

beats per minute). Schlueter complained of lightheadedness and dizziness and reported that he had experienced numerous syncopal episodes. Dr. Kondos noted that EKGs from September 2009, February 2010, and April 2010 all recorded heart rates between 40 and 50 beats per minute, indicating sinus bradycardia. After examination, Dr. Kondos felt that Schlueter's symptoms could be vasovagal in origin,[3] related to his bradycardia, or related to his psychiatric medications (Klonopin and Vistaril). Dr. Kondos suggested that Schlueter have his psychiatric medications reviewed and that he undergo lab tests, an echocardiogram, and a tilt table test.[4] Dr. Kondos also recommended that Schlueter receive a heart event monitor to note when his episodes of lightheadedness and syncope occur. On May 19, Schlueter followed up with Dr. Carter. Schlueter complained of dizziness and syncopal symptoms, but on physical examination, his heart had regular rate and rhythm. Following Dr. Kondos' recommendations, Dr. Carter planned for Schlueter to wear a heart monitor and to undergo blood tests, an echocardiogram, and a tilt table test.

Schlueter first saw Dr. Dominguez on June 23, for treatment of hypothyroidism. At this visit, Schlueter's heart rate was 64 beats per minute. Dr. Dominguez noted Schlueter's cardiac

---

[3] The term "vasovagal" refers to a malfunction in the part of an individual's nervous system that regulates heart rate and blood pressure in response to a trigger, such as the sight of blood or extreme emotional distress. *See Vasovagal syncope – Symptoms and causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/symptoms-causes/syc-20350527. The malfunction causes the individual's heart rate to slow and his blood pressure to drop, which, in turn, reduces blood flow to the individual's brain, causing him to faint. *Id.*

[4] For a tilt table test, the medical professional first straps the patient to a table and measures the patient's blood pressure and heart rate. The professional then tilts the patient upward from the horizontal position and monitors the patient's blood pressure and heart rate for 20 to 30 minutes. If the patient does not demonstrate any symptoms, the medical professional returns the patient to the horizontal position, gives the patient a stimulating agent, and then tilts the patient back up for a similar amount of time. The test is positive if the patient's blood pressure decreases and he or she feels dizzy or faint during the test; the test is negative if the patient's heart rate increases only slightly, his or her blood pressure does not drop significantly, and the patient does not have signs or symptoms of fainting. Doc. 197 at 9 (USOF No. 30); *Tilt table test*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/tilt-table-test/about/pac-20395124.

problems and that further testing was scheduled to soon take place at UIC's cardiovascular clinic.

From June 25 to July 9, Schlueter wore a Holter monitor. Schlueter then followed up with Dr. Kondos on July 19. He reported occasional lightheadedness and dizziness, plus two episodes of near syncope since his May 3 visit with Dr. Kondos. Schlueter's blood pressure was slightly hypertensive (138 over 82) and his pulse was low (45 beats per minute), but his physical examination was normal. Dr. Kondos noted that Schlueter's recent echocardiogram (performed on June 25) was normal, and he reviewed the results of the Holter monitor, which showed episodes of bradycardia and tachycardia ranging from 45 to 166 beats per minute. Dr. Kondos noted, however, that Schlueter's "[s]ymptoms did not correlate with any significant rhythm disturbance," and he considered the Holter results to be "unremarkable."[5] Doc. 197-3 at 70–71.[6] Dr. Kondos again recommended that Schlueter undergo a tilt table test. Schlueter saw Dr. Carter two days later, who noted that Schlueter's heart looked normal. Dr. Carter recommended that Schlueter undergo a tilt table test, and Wexford approved Dr. Carter's recommendation.

Per Dr. Carter's referral, Schlueter saw Dr. Melissa Robinson at UIC's cardiology clinic on August 10 to undergo a tilt table test. Dr. Robinson is board-certified in cardiovascular disease and clinical cardiac electrophysiology. Dr. Robinson recorded Schlueter's pre-procedure

---

[5] At his February 2019 deposition, Dr. Kondos opined that Schlueter's June-July 2010 Holter monitor results indicated that Schlueter could have "tachy brady syndrome," which is a condition where the heart beats very fast and then very slow. Doc. 197-3 at 13–14; *Sick sinus syndrome – Symptoms and causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/sick-sinus-syndrome/symptoms-causes/syc-20377554 (hereinafter, "*Sick sinus syndrome*") (defining "bradycardia-tachycardia syndrome" as when "[t]he heart rate alternates between abnormally slow and fast rhythms, usually with a long pause (asystole) between heartbeats"). But there is no indication that Dr. Kondos or any other doctor identified tachy brady syndrome as a possible diagnosis for Schlueter's issues during the relevant time period.

[6] The Court cites to the page number(s) set forth in a document's ECF header.

diagnosis as pre-syncope,[7] and she noted that he had a history of pre-syncopal episodes over the last few years, with symptoms including auditory disturbances, headache, weakness, and excessive sweating. Dr. Robinson also recorded that Holter monitoring during two of the episodes "showed sinus bradycardia and sinus tachycardia." Doc. 197-6 at 95. The results of the tilt table test were negative and "essentially unrevealing"—there were non-specific findings of a headache and dizziness, but no change in blood pressure. *Id.* at 95–96; Doc. 197 at 9 (USOF No. 33). Dr. Robinson opined that Schlueter's pre-syncope appeared to be vasovagal in nature, with some component of anxiety, and she counseled Schlueter about hydration and measures to avoid fainting. Finally, Dr. Robinson recommended that Schlueter's doctors should "consider Nadolol 10mg daily" if significant symptoms, "such as dizziness, slow heart rate, lightheadedness, and syncopal episodes," continued. Doc. 197-6 at 96; Doc. 197 at 10 (USOF No. 34).

Nadolol is a beta blocker that is typically used to treat patients with tachycardia and vasovagal symptoms. More generally, beta blockers are medications that cause an individual's "heart to beat more slowly and with less force, which lowers blood pressure." *Beta blockers*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/beta-blockers/art-20044522. They "also help open up [an individual's] veins and arteries to improve blood flow." *Id.* Beta blockers can be used to stabilize the heart's electrical activity and control a patient's heart rate, and to address tachycardia, dysrhythmia, high blood pressure, and headaches. Patients with slower heart rates can take beta blockers, as can patients with pacemakers. Beta blockers are relatively short-lived medications; once a patient stops taking a beta blocker, it is washed out of the patient's system with no residual side effects, and a patient's

---

[7] Pre-syncope is the feeling that one is about to faint, and "[s]omeone with pre-syncope may be lightheaded (dizzy) or nauseated, have a visual 'gray out' or trouble hearing, have palpitations, or feel weak or suddenly sweaty." *Syncope*; Doc. 197 at 8 (USOF No. 29) ("Pre-syncope includes symptoms of dizziness that may proceed to passing out.").

heart rate should no longer be affected once the beta blocker is out of his or her system. In particular, low to medium dosages of beta blockers, such as 10 mg of Nadolol, will generally not have any lasting side effects.

Schlueter followed up with Dr. Carter shortly after undergoing the tilt table test. Dr. Carter informed Schlueter "that the results of the tilt table test were normal," and he noted that, upon physical examination, all of Schlueter's "neurological and cardiovascular tests were normal." Doc. 197-14 at 7. Accordingly, "no further treatment of work-up" was needed at the time. *Id.* Nonetheless, Schlueter presented to Dr. Carter three months later, on November 16, complaining of dizziness, falling, knee pain, headaches, and blurry vision. Schlueter also requested a low bunk permit. Schlueter's objective examination was normal, but his heart rate was 56 beats per minute, and he was behaving oddly. Dr. Carter assessed Schlueter with anxiety and neurosis and referred him to an eye doctor for his blurred vision.

On December 28, Schlueter saw Dr. Dominguez for management of his thyroid disorder. At this time, Schlueter's heart rate was normal (65 beats per minute). Schlueter saw Dr. Dominguez again about two weeks later, on January 10, 2011, to request a low bunk permit. Schlueter reported a history of bradycardia, falling down, and migraine headaches. Dr. Dominguez ordered a one-year low bunk permit to mitigate Schlueter's risk of falling, and she prescribed him pain medication and an anti-depressant.

On March 14, Schlueter presented to Dr. Carter complaining of a headache, skin rashes, right knee pain, and a concern that he was losing weight. Schlueter also appeared to have overwhelming anxiety. Schlueter did not report any issues with his heart rate, and his heart rate at the visit was 60 beats per minute. Dr. Carter determined that although Schlueter had knee bursitis, he did not have a rash and his weight was unchanged. Dr. Carter also could not

determine the cause of Schlueter's headaches. He referred Schlueter for a mental health appointment for his apparent anxiety, and he prescribed an anti-inflammatory medication for Schlueter's bursitis. This was the last time Schlueter saw Dr. Carter.

Thereafter, on March 25, Schlueter presented to PA Valdez complaining of dizziness, falling, and right-knee pain with decreased range of motion. PA Valdez noted Schlueter's negative tilt table test and the fact that a doctor at UIC had recommended Nadolol "if needed."[8] Doc. 197-6 at 83. Relying on this recommendation, PA Valdez prescribed Schlueter a low dose (20 mg, twice per day) of another beta blocker, Propranolol. As with other beta blockers, medical professionals can use Propranolol to treat migraine headaches and cardiac issues. PA Valdez prescribed Propranolol because it was available through Dixon's formulary, whereas Nadolol was not, and medical professionals at Dixon had to obtain approval before prescribing Nadolol. She reasoned that by prescribing Propranolol—which is in the same class of medication as Nadolol but did not require prior approval before prescribing—she could see if it helped Schlueter and, if not, that would provide a basis to obtain approval to prescribe Nadolol.

Schlueter saw PA Valdez again on April 13, after he fell on his right knee. Schlueter reported that he was still experiencing fatigue and that the Propranolol "tears [his] stomach up." Doc. 197 at 14 (USOF No. 50). Although Propranolol may cause a little nausea when first taken, it typically does not cause gastrointestinal distress, and PA Valdez continued the present plan of treatment. Later, on May 9, Schlueter presented to PA Valdez complaining of nausea and an upset stomach, which he again attributed to Propranolol. PA Valdez switched Schlueter's Propranolol prescription to a low dose (50 mg, once in the evening) of a different beta blocker, Lopressor. Less than two weeks later, on May 20, Schlueter reported to PA Valdez that he was

---

[8] Although PA Valdez's notes do not identify the doctor, the parties do not dispute that the notes are referring to Dr. Robinson's August 10, 2010 note that stated "[i]f significant symptoms continue, consider Nadolol 10mg daily." Doc. 197-6 at 95–96.

"doing better." Doc. 197 at 14 (USOF No. 52). Schlueter's heart rate was normal (72 beats per minute), as was his blood pressure; his weight was stable; and he looked well. Because Schlueter's blood pressure and heart rate were within normal ranges, PA Valdez believed that Schlueter had improved while taking Lopressor, and she renewed Schlueter's Lopressor prescription.

On July 29, Schlueter saw Dr. Dominguez for a physical examination. Schlueter reported that his "heart [was] messed up" and that he had been diagnosed with bradycardia 10 years earlier. Doc. 197 at 15 (USOF No. 53). Schlueter's heart rate was normal but the rhythm was irregular.

Schlueter next saw PA Valdez on October 31, when he presented complaining of dizziness and headaches and requesting a refill of his medication. Schlueter reported that he was becoming "immune" to his medications and that he also fell the night before. Doc. 197 at 15 (USOF No. 54). The results of Schlueter's physical examination were normal, and his heart rate was 80 beats per minute. PA Valdez could not identify any injuries from Schlueter's recent fall, but she instructed Schlueter to advise the prison staff of any other falls and provided him pain medication. She also ordered weekly blood pressure and vital sign checks for four weeks, gave him a five-day "lay-in," and renewed his Lopressor prescription.

Schlueter paid PA Valdez another visit the following month, on November 21. Schlueter complained of a decreased heart rate, a pounding headache, and on-and-off dizziness. Both his blood pressure and heart rate (40 beats per minute) were low. PA Valdez diagnosed Schlueter with bradycardia and an acute headache. She gave him pain medication and ordered that his heart rate be checked every hour. She also referred Schlueter to a psychiatrist to see if his psychotropic medications were contributing to his issues.

On December 20, Schlueter saw Dr. Dominguez, who discontinued his Lopressor prescription. Dr. Dominguez made this decision "because she was concerned that [Schlueter's] syncopal episodes were related to his bradycardia, and [she] wanted to see if there was an improvement or change in his symptoms." Doc. 197 at 16 (USOF No. 56).

The following month, on January 20, 2012, Schlueter presented to PA Valdez complaining of a swollen nose and reporting a decrease in heart rate since Dr. Dominguez had discontinued his Lopressor. Schlueter told PA Valdez that he wanted to begin taking Lopressor again. PA Valdez planned for Schlueter to use a nasal spray and take 50 mg of Lopressor every evening, and she also noted that she would consider obtaining Nadolol for Schlueter to take instead of Lopressor.

Schlueter next saw PA Valdez on March 1. At this time, Schlueter complained of lightheadedness and headaches. His blood pressure was normal (106 over 60) and his heart rate was 58 beats per minute. PA Valdez assessed Schlueter as having a history of vasovagal syncope and bradycardia, and she ordered a low dose of Nadolol (10 mg) to be taken by Schlueter once per day. PA Valdez did so because she was not getting the results she wanted, as Schlueter was reporting some instances of improvement and some instances of non-improvement while taking the other beta blockers, and she wanted to try the specific medication that Dr. Robinson recommended to see if it made any difference. Wexford approved PA Valdez's request for Nadolol, and Schlueter eventually received the medication.

Schlueter followed up with PA Valdez on April 5. Schlueter had no new complaints and he indicated that he was feeling better. He also reported that his Nadolol prescription was improving his condition. His vital signs were stable, his heart rate was 55 beats per minute, and his blood pressure was 110 over 70. Based on Schlueter's reports that the Nadolol was working,

11

PA Valdez submitted another request for Schlueter to take 10 mg of Nadolol daily. This was the last time Schlueter saw PA Valdez.

Schlueter first saw Dr. Wahl on April 11, when he presented complaining of low back pain that had started when he began taking Nadolol. Upon physical examination, Dr. Wahl found tenderness in Schlueter's lower back. She ordered a urinalysis to investigate potential causes for Schlueter's back pain, such as a urinary tract infection, and she instructed Schlueter to follow up if he continued to have back pain. Based on her review of Schlueter's medical records, Dr. Wahl also assessed Schlueter with vasovagal syncope. Schlueter's blood pressure (110 over 70) and heart rate (70 beats per minute) at this visit were normal.

On July 17, Schlueter saw Dr. Funk. Dr. Funk noted Schlueter's history of syncopal episodes and his report that the episodes had recently worsened. Dr. Funk also noted Schlueter's Nadolol prescription (10 mg daily). Dr. Funk planned to refer Schlueter to UIC's cardiovascular lab for further treatment, and, a week later, he obtained approval from Wexford for this referral.

On October 26, Schlueter returned to see Dr. Kondos at UIC's cardiology clinic. Schlueter's blood pressure was high (142 over 81) and his pulse was low (35 beats per minute). He reported that he continued to experience lightheadedness and syncope. He also reported that he was taking 10 mg of Nadolol daily and that although his symptoms had improved for about a month after starting the medication, they had resumed thereafter. Dr. Kondos admitted Schlueter to UIC's hospital to consider giving him a pacemaker to address his low heart rate.

Upon admission to the hospital, Schlueter saw Dr. Amir Ardati, who is board-certified in internal medicine, cardiovascular medicine, and interventional cardiology. Dr. Ardati noted Schlueter's five-to-six-year history of intermittent syncope that was worsening and EKG findings indicating bradycardia. Dr. Ardati also recorded that Schlueter was taking 10 mg of

Nadolol with some resolution of bradycardia and syncope but that his symptoms had promptly returned upon stopping the medication.[9] Dr. Ardati's differential diagnosis[10] indicated "likely sick sinus [syndrome] vs. primary sinus bradycardia."[11] Doc. 197 at 19 (USOF No. 69); Doc. 197-11 at 43. Dr. Ardati recommended additional testing and a consultation with an electrophysiologist to consider the implantation of a pacemaker. Schlueter saw Dr. Ardati again the next two days, October 27 and October 28. The night before the October 27 visit, Schlueter was bradycardic for most of the night, followed by episodes of acute sinus rhythm. At the October 27 visit, Dr. Ardati planned for Schlueter to be monitored by cardiology with a likely electrophysiology consult two days later. The following day, Schlueter reported chest pain, and Dr. Ardati noted that Schlueter had experienced bradycardia the previous night.

On October 29, Schlueter saw Dr. Boaz Avitall at UIC. Dr. Avitall could not determine the underlying cause of Schlueter's bradycardia, but he explained that the final treatment for symptomatic bradycardia is a pacemaker. The next day, UIC discharged Schlueter and sent him back to Dixon. The medical professionals at UIC provided Schlueter with a Holter monitor to wear for 30 days, but they did not order Schlueter to take any new medications.

---

[9] Schlueter denies that Nadolol ever resolved his bradycardia, but his denial is supported only by an unintelligible citation: "DOC-440:2." Doc. 197 at 19 (USOF No. 69). The Court therefore continues to treat this fact as undisputed.

[10] In making a differential diagnosis, a physician "systematically compares and contrasts clinical findings from a patient's medical history to determine 'which of two or more diseases with similar symptoms is the one from which the patient is suffering.'" *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (citation omitted).

[11] Sick sinus syndrome is a condition where the heart's natural pacemaker (the sinus node) malfunctions, causing the heart to beat too fast and sometimes too slow. Doc. 197 at 3 (USOF No. 9); *Sick sinus syndrome* ("In sick sinus syndrome, the electrical signals [created by the sinus node] are abnormally paced. Your heartbeat can be too fast, too slow, interrupted by long pauses—or an alternating combination of these rhythm problems."). In those instances where the heart beats too fast, the heart does not fill with blood and, as a result, there is no blood to eject from the heart to the brain.

Schlueter saw Dr. Avitall again on January 18, 2013 to discuss the results of the Holter monitor. At this time, Schlueter's records indicated that he was still taking Nadolol. Dr. Avitall noted that Schlueter's symptoms seemed vasovagal in nature and that his bradycardia may not have been causing his syncope. Dr. Avitall was also concerned that Schlueter's syncopal episodes were not related to a medical issue. Dr. Avitall recommended that Schlueter receive a pacemaker. Schlueter agreed. Although the risks of having a pacemaker vary from patient to patient based on their individualized health conditions, Dr. Avitall testified that there was little risk of harm to Schlueter from having a pacemaker. He also testified that having a pacemaker will not shorten Schlueter's life expectancy. On January 30, Dr. Kevin Smith, a doctor at Dixon, obtained approval from Wexford for Schlueter's recommended pacemaker implantation. Less than a week later, on February 5, Dr. Avitall performed the implantation.

After the pacemaker implantation, Schlueter returned to Dixon, where he saw Dr. Smith on February 7. At this visit, Schlueter denied any chest pain, dizziness, or shortness of breath. Because Schlueter now had a pacemaker, Dr. Smith discontinued his Nadolol prescription. On February 13, Dr. Smith obtained approval to refer Schlueter to UIC for a follow-up appointment with his cardiologist.

On February 19, Schlueter presented to Dr. Dominguez complaining of neck pain and swelling over the site of his pacemaker. Dr. Dominguez noted that the pacemaker was working well and looked clean and in place. She did not notice any evidence of unusual lumps or bumps in the pacemaker pocket or signs of edema or bruising. Even so, Dr. Dominguez referred Schlueter to UIC's cardiology clinic for further follow up.

Dr. Avitall's office subsequently checked Schlueter's pacemaker on March 22. Schlueter's pacemaker was pacing 45 percent of his heartbeats to keep his heart rate at 60 beats

per minute. Dr. Avitall explained that the pacemaker was doing its job and keeping Schlueter's heart at a physiological state.

On November 23, Schlueter presented to Dr. Dominguez complaining of chest pain and issues with his pacemaker. Dr. Dominguez's objective examination of Schlueter was normal, as was an EKG taken that day, which showed Schlueter's heart rate to be 60 beats per minute. At the time, Schlueter already had an appointment with UIC's cardiology clinic scheduled.

Two months later, on January 24, 2014, Dr. Avitall's office checked Schlueter's pacemaker again. Dr. Avitall noted no issues with the pacemaker, which was regulating 61 percent of Schlueter's heartbeats, and he planned to check the pacemaker again in six months. After returning from UIC, Schlueter saw Dr. Wahl for a follow up appointment on January 30. Schlueter's pulse and blood pressure were normal. Dr. Wahl noted that there were no issues with the pacemaker and that Schlueter was recommended to return to the pacemaker clinic in six months.

On April 2, Schlueter presented to Dr. Dominguez complaining of headaches, chest pain, and symptoms of syncope. Schlueter's heart rate was normal at 60 beats per minute. Dr. Dominguez ordered a chest x-ray, lab tests, and a referral to UIC for follow up on his pacemaker. Sometime thereafter, Schlueter ended up in the prison infirmary after being electrically shocked while using a floor polisher. On May 21, while in the infirmary, Schlueter saw Dr. Wahl. He complained of migraine headaches and requested to be discharged from the infirmary. His blood pressure and pulse were normal, and Dr. Wahl planned to see Schlueter the following morning and to discharge him from the infirmary at that time. After being discharged from the infirmary, Schlueter presented to Dr. Dominguez on May 27, complaining of ongoing headaches since his electrical shock. Dr. Dominguez prescribed Excedrin for Schlueter's headaches.

15

On or around June 25, Dr. Wahl sought and obtained approval from Wexford to send Schlueter to UIC for another check of his pacemaker. Dr. Avitall's office then checked Schlueter's pacemaker on August 8. The pacemaker was functioning normally and still pacing Schlueter's heart rate 61 percent of the time. Schlueter saw Dr. Wahl on August 12 after returning from UIC. Dr. Wahl noted that the pacemaker was functioning, and she planned to request another six-month follow-up appointment in line with the cardiologist's recommendation.

Approximately six months later, on February 6, 2015, Schlueter saw Dr. Avitall for a checkup on his pacemaker. The pacemaker was pacing 55 percent of Schlueter's heartbeats and otherwise functioning normally.

On July 2, Schlueter presented to Dr. Dominguez complaining of a hernia and a racing heartbeat at night. Schlueter's heart rate was regular at 72 beats per minute. Dr. Dominguez found no evidence of a hernia, but she assessed Schlueter as having episodes of tachycardia at night. Dr. Dominguez ordered Schlueter to avoid caffeine, instructed him to report to the health care unit if he continued to experience tachycardia, and ordered lab tests and a follow up in four weeks. Dr. Dominguez also noted that Schlueter was already scheduled to follow up with UIC's cardiology clinic. Schlueter saw Dr. Dominguez again on September 15, when he reported an increased heart rate and complaints of numbness and tingling in his hand, fingers, and arm. Schlueter reported that the numbness and tingling had been occurring for several months and that they mostly occurred when his heart was racing at night. He also reported that his pacemaker was moving in its cavity. Schlueter had a heart rate of 62 beats per minute and no shortness of breath, but he was very anxious and reported that he was waiting to see UIC's cardiology

16

department to address his issues. Dr. Dominguez planned to refer Schlueter to UIC for further workup.

On May 21, 2018, Schlueter saw Dr. Sorin Lazar at UIC's cardiology clinic to see whether he could have his pacemaker removed.[12] Schlueter did not think he needed a pacemaker, and it bothered him at night while he slept (which he did lying on his stomach). Dr. Lazar examined the pacemaker and found that it was not loose and did not move around upon manipulation. He also explained to Schlueter that he could avoid nighttime discomfort by sleeping on his back. Dr. Lazar was not convinced that Schlueter no longer needed the pacemaker, but he planned to decrease the settings on the pacemaker and follow up with Schlueter. Schlueter saw Dr. Lazar for his follow-up appointment three weeks later, on June 11. Schlueter still wanted the pacemaker removed and he reported pain and movement of the pacemaker in its pocket. Upon examination and manipulation of the pacemaker, however, Schlueter did not demonstrate any pain, and the pacemaker was stable in the pocket. Dr. Lazar did not believe Schlueter's pain complaints and felt that extracting the pacemaker would be more harmful than helpful. When Schlueter saw Dr. Lazar again on October 8, he again requested for the pacemaker to be removed. But the pacemaker was still pacing at a level that made it necessary. Moreover, Dr. Lazar was concerned that removing the pacemaker could kill Schlueter. It is Dr. Lazar's opinion that Schlueter needs a pacemaker and that extracting the pacemaker is contraindicated.

## II. Procedural Background

On March 7, 2013, Schlueter filed a grievance regarding his medical treatment. The Illinois Department of Corrections ("IDOC") denied Schlueter's grievance on May 20, 2014.

---

[12] The parties do not identify any evidence of medical treatment between Schlueter's September 15, 2015 visit with Dr. Dominguez and his May 21, 2018 visit with Dr. Lazar.

On February 6, 2015, Schlueter filed a *pro se* complaint that named every Defendant except Dr. Wahl.[13]  The Court recruited counsel for Schlueter, who filed the operative third amended complaint on March 17, 2016.  Fact discovery closed on April 19, 2019.  Defendants now move for summary judgment.  Schlueter, represented by recruited counsel, opposes the motion.[14]

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record.  Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).  The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018).  In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial.  Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014).

In resolving a summary judgment motion, the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013).  However, a bare contention by

---

[13] Schlueter added Dr. Wahl as a defendant in his second amended complaint.

[14] After the parties completed their summary judgment briefing, Schlueter sought leave to dismiss recruited counsel and proceed *pro se*.  The Court granted Schlueter's request.

the non-moving party that an issue of fact exists does not create a factual dispute, *N. Assurance Co. of Am. v. Summers*, 17 F.3d 956, 961 (7th Cir. 1994), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).  Ultimately, "[t]o defeat summary judgment, a party must present a 'genuine dispute' of material fact such that a reasonable jury could find in its favor."  *PMT Mach. Sales, Inc. v. Yama Seiki USA, Inc.*, 941 F.3d 325, 328 (7th Cir. 2019) (citations omitted).

## ANALYSIS

### I.      Statute of Limitations

Defendants first argue that the statute of limitations bars Schlueter's deliberate indifference claims against Dr. Carter and PA Valdez.  The applicable statute of limitations, as the parties agree, is two years.  *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013).  Schlueter also concedes that the statute of limitations bars his deliberate indifference claims against Dr. Carter as well, *see* Doc. 198 at 12, 20 n.6, so the Court grants summary judgment in Dr. Carter's favor on that basis.[15]  As for his claims against PA Valdez, Schlueter does not dispute that the statute of limitations began running on April 5, 2012, the last day PA Valdez treated him.  *Id.* at 11 ("P.A. Valdez last treated Mr. Schlueter on April 5, 2012, ending her continuing violation of his rights."); *see Turley*, 729 F.3d at 651 ("For continuing Eighth Amendment violations, the two-year period starts to run (that is, the cause of action accrues) from the date of the last

---

[15] Dr. Carter last saw Schlueter on March 14, 2011, and he left his role as Dixon's Medical Director on July 24, 2011.  Even accounting for the 439-day tolling period asserted by Schlueter, the statute of limitations expired with respect to Dr. Carter in October 2014 at the latest, before Schlueter filed his complaint in February 2015.  *See Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 517–18 (7th Cir. 2019) (finding that the date of a medical professional's departure from the prison marked "the last possible time when the [deliberate indifference] claim might have accrued").

incidence of that violation[.]").  Nor does Schlueter dispute that more than two years had passed since April 5, 2012 when he filed his claims against PA Valdez.

Schlueter, however, argues that the process of exhausting his administrative remedies prior to filing suit tolled the statute of limitations for that period of time.  To determine whether tolling applies, the Court looks to Illinois' tolling rules.  *Devbrow v. Kalu*, 705 F.3d 765, 767 (7th Cir. 2013); *Johnson v. Rivera*, 272 F.3d 519, 521 (7th Cir. 2001).  In Illinois, a court "must toll the statute of limitations if a 'statutory prohibition' exists that prevents a plaintiff's cause of action."  *Johnson*, 272 F.3d at 521 (quoting 735 Ill. Comp. Stat. 5/13-216).  "Here, such a statutory prohibition exists" because the Prison Litigation Reform Act ("PLRA") requires an inmate to exhaust his "administrative remedies prior to filing suit under § 1983."  *Id.* (citing 42 U.S.C. § 1997e(a)).  Therefore, "in the ordinary case, a federal court relying on the Illinois statute of limitations in a § 1983 case must toll the limitations period while a prisoner completes the administrative grievance process."  *Id.* at 522; *Walker v. Sheahan*, 526 F.3d 973, 978 (7th Cir. 2008) ("While a 2-year statute of limitations does indeed apply to Walker's § 1983 claims, the limitations period is tolled while a prisoner completes the administrative grievance process." (citation omitted)).  "The tolling period starts when the prisoner files his grievance and ends when the administrative review process is over."  *Petties v. Dybas*, No. 16-cv-7929, 2018 WL 3970148, at *8 (N.D. Ill. Aug. 20, 2018).

On March 7, 2013, Schlueter filed a grievance regarding his medical treatment.  IDOC denied the grievance on May 20, 2014.  Schlueter contends that the statute of limitations was tolled during this time period (which he calculates to be 439 days), meaning that the statute of

limitations did not expire until after he filed his claims against PA Valdez.[16]  Defendants do not

challenge Schlueter's calculation, nor do they dispute that Schlueter's claims against PA Valdez

are timely if the Court tolls the statute of limitations for this period of time.  Instead, Defendants

contend that Schlueter did not file his grievance within 60 days of PA Valdez's last treatment

and that the grievance did not identify PA Valdez as the subject of the grievance.  *See* Ill. Admin.

Code tit. 20, § 504.810(a), (b) (2013) ("A grievance shall be filed within 60 days after the

discovery of the incident, occurrence, or problem that gives rise to the grievance. . . .  The

grievance shall contain factual details regarding each aspect of the offender's complaint,

including what happened, when, where, and the name of each person who is the subject of or

who is otherwise involved in the complaint.").  Because Schlueter's grievance did not comply

with the applicable administrative requirements, Defendants continue, it has no tolling effect.

The problem is that Defendants do not identify any legal authority to support their

argument, such as a case holding (or even suggesting) that a prisoner's failure to comply with all

applicable administrative procedures while pursuing an administrative remedy prevents that

pursuit from tolling the statute of limitations.  Given Defendants' failure to provide any legal

basis for their argument, the Court does not find it appropriate to rule, as a matter of law on

summary judgment, that Schlueter's pursuit of his administrative remedies (even if imperfect)

does not toll the statute of limitations.  *Cf. Schaefer v. Universal Scaffolding & Equip., LLC*, 839

F.3d 599, 607 (7th Cir. 2016) ("arguments unsupported by legal authority" are waived).

Accounting for the 439 days it took IDOC to complete the administrative review process, the

statute of limitations for Schlueter's claims against PA Valdez did not expire until June 2015,

---

[16] Schlueter incorrectly asserts that a 439-day tolling period would cause the statute of limitations to expire in June 2016—the statute of limitations would in fact expire in June 2015.  This error is immaterial, however, because Schlueter filed his claims against PA Valdez before June 2015.

after Schlueter filed his claims on February 6, 2015.  The Court therefore denies summary judgment on statute of limitations grounds with respect to Schlueter's claims against PA Valdez.

## II. Deliberate Indifference Claims Against the Individual Defendants

The Eighth Amendment protects an inmate from a medical professional's deliberate indifference to (1) the inmate's "*current* serious health problems," as well as (2) "conditions posing an unreasonable risk of serious damage to [the inmate's] *future* health." *Roe v. Elyea*, 631 F.3d 843, 857–58 (7th Cir. 2011) (emphases in original) (citation omitted).  Schlueter contends that Defendants were deliberately indifferent to both his current serious medical needs (Count I) and his future health (Count II).  The Court refers to these claims as Schlueter's "current health" claims and his "future health" claims, respectively.

As an initial matter, the Court notes that Schlueter asserts his current health and future health claims against every Defendant, including Wexford.  *See, e.g.*, Doc. 55 at 1 (defining all defendants, including Wexford, collectively as "Defendants"); *id.* ¶¶ 54, 58–64, 66, 70 (instances where Schlueter generally refers to "Defendants" in Counts I and II).  A private corporation's liability for alleged deliberate indifference, however, is "cabined by" the Supreme Court's decision in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978).  *Barrow v. Wexford Health Sources, Inc.*, 793 F. App'x 420, 424 (7th Cir. 2019).  And under *Monell*, a private corporation like Wexford is liable only if it "maintained an unconstitutional policy or custom" that caused "the injury that is the basis of [Schlueter's] § 1983 claim."  *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1035 (7th Cir. 2019) (citation omitted); *see McKay v. Odom*, 726 F. App'x 493, 494 (7th Cir. 2018) ("McKay can proceed to trial against Wexford [on a deliberate indifference claim] only if he supplied evidence that 'his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to

22

medical needs, or a series of bad acts that together raise the inference of such a policy.'" (quoting *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014)).  Although Count III of Schlueter's operative complaint alleges an unconstitutional Wexford policy, Counts I and II do not.  Therefore, to the extent Schlueter intended to assert his current health and future health claims against Wexford, the Court grants summary judgment in Wexford's favor.

Accordingly, the Court addresses only Schlueter's current health and future health claims with respect to PA Valdez, Dr. Wahl, Dr. Funk, and Dr. Dominguez.

### A.      Current Health Claims

Schlueter contends that decisions made by PA Valdez, Dr. Wahl, Dr. Funk, and Dr. Dominguez regarding the prescription of beta blockers demonstrate their deliberate indifference to his current medical condition.  *See, e.g.*, Doc. 198 at 15 ("The Defendants are therefore liable to Mr. Schlueter because they either prescribed him a beta-blocker or failed to take him off the beta-blocker he was already improperly prescribed.").  Deliberate indifference to an inmate's current medical needs has both objective and subjective elements: (1) the inmate must have an objectively serious medical condition, and (2) the defendant must be subjectively aware of and disregard a substantial risk of harm to the inmate's health.  *Goodloe v. Sood*, 947 F.3d 1026, 1030–31 (7th Cir. 2020); *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc).  Because Defendants do not dispute that Schlueter suffered from one or more objectively serious medical conditions, the Court considers solely whether a reasonable jury could find in Schlueter's favor on the subjective element of his current health claim.

To satisfy the subjective element, the defendant must actually know about a substantial risk of harm to an inmate and then disregard that risk.  *Petties*, 836 F.3d at 728; *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).  This requires the defendant to act with a sufficiently

"culpable state of mind, something akin to criminal recklessness." *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006). Negligence, even gross negligence, does not satisfy this standard. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Nor does objective recklessness, i.e., "failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known." *Petties*, 836 F.3d at 728 (emphasis in original).

The Court must "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Id.* Although a mistake in professional judgment alone does not constitute deliberate indifference, evidence that a defendant "knew better than to make the medical decision[s]" that he or she made is enough to survive summary judgment. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016) (citation omitted). Evidence sufficient to create a jury question as to a medical professional's state of mind might include

> the obviousness of the risk from a particular course of treatment, the defendant's persistence in a course of treatment known to be ineffective, or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment.

*Id.* at 663 (citations omitted) (internal quotation marks omitted).

### 1. PA Valdez

Schlueter contends that PA Valdez was deliberately indifferent to his current medical needs by (1) prescribing him Propranolol, a beta blocker, in March 2011; (2) switching him from Propranolol to another beta blocker, Lopressor, in May 2011, and thereafter continuing the Lopressor prescription; and (3) switching him from Lopressor to yet another beta blocker, Nadolol, in March 2012. Specifically, Schlueter asserts that PA Valdez should not have

prescribed him any of these medications because beta blockers of any type or brand should not be prescribed to someone with bradycardia or sick sinus syndrome.

"To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396. Put another way, the Court must defer to PA Valdez's course of treatment unless "no minimally competent professional would have so responded under those circumstances." *Wilson*, 932 F.3d at 519 (citation omitted). A "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Given these standards, no reasonable jury could find that PA Valdez was deliberately indifferent in making her treatment decisions. PA Valdez first prescribed Schlueter a beta blocker (Propranolol) because she believed that a cardiologist at UIC, Dr. Robinson, had recommended a comparable beta blocker (Nadolol). PA Valdez's decision to prescribe a beta blocker based on what she believed to be the recommendation of a specialist runs contrary to a finding of deliberate indifference. *See Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016) ("Instructions from a specialist are evidence that the defendant knew a particular course of treatment was recommended by at least one other medical professional[.]"); *McGhee v. Suliene*, No. 13-cv-67-bbc, 2014 WL 576150, at *9 (W.D. Wis. Feb. 12, 2014) ("[I]t is difficult to see how Suliene could be blamed for not identifying plaintiff's need for surgery as an emergency when she was simply following the recommendations of the specialists that plaintiff saw."); *cf. Zaya*, 836 F.3d at 806 ("A jury can infer conscious disregard of a risk from a defendant's decision *to ignore* instructions from a specialist." (emphasis added)).

In his summary judgment response, Schlueter points out that Dr. Robinson testified in January 2018 that she had not fully evaluated him and that she would have left the decision to prescribe Nadolol or another beta blocker to Schlueter's primary treater. But Dr. Robinson did not convey these qualifications in the note reviewed by PA Valdez. Instead, Dr. Robinson's note simply said "[i]f significant symptoms continue, consider Nadolol 10mg daily." Doc. 197-6 at 96. Based on this note, PA Valdez had no reason to know—in March 2011—that Dr. Robinson had not intended for a medical professional to prescribe Nadolol (or any other beta blocker) without first evaluating Schlueter more fully. *See Petties*, 836 F.3d at 728 ("To determine if a prison official acted with deliberate indifference, we look into his or her subjective state of mind."); *see also Whiting*, 839 F.3d at 662 ("[W]ithout more, a mistake in professional judgment cannot be deliberate indifference.").

Then, after prescribing Propranolol, PA Valdez repeatedly adjusted Schlueter's medications and course of treatment to address his reports and complaints. After Schlueter complained that Propranolol was causing him nausea and stomach trouble, PA Valdez discontinued the prescription, even though Propranolol typically does not cause gastrointestinal distress. PA Valdez replaced the Propranolol with a low dose of Lopressor (50 mg, once per evening), which initially helped—less than two weeks later, Schlueter reported that he was doing better on Lopressor, his heart rate and blood pressure were normal, and he looked well. Accordingly, PA Valdez renewed Schlueter's Lopressor prescription. In October 2011, after Schlueter reported dizziness, a headache, a recent fall, and becoming "immune" to his medications, PA Valdez gave Schlueter a five-day "lay-in" and ordered him to undergo weekly blood pressure and vital sign checks for four weeks. The following month, when PA Valdez diagnosed Schlueter with bradycardia, she ordered that his heart rate be checked every hour, and

she referred Schlueter to see a psychiatrist to see if his psychotropic medications were

contributing to his issues.  In January 2012, after Dr. Dominguez had discontinued his Lopressor

prescription, Schlueter reported that his heart rate had decreased since being taken off Lopressor

and *he requested* to take Lopressor again.  Accordingly, PA Valdez put Schlueter back on

Lopressor.  By March 2012, however, PA Valdez was not getting the results she wanted, as

Schlueter was reporting only some instances of improvement.  PA Valdez wanted to try the

specific medication that she believed had been recommended by Dr. Robinson to see if it made

any difference, so she submitted a request for 10 mg of Nadolol, which Wexford approved and

Schlueter eventually received.  And when PA Valdez saw Schlueter for the last time the

following month, Schlueter reported that he was feeling better and that the Nadolol was

improving his condition.  Far from exhibiting deliberate indifference, PA Valdez's entire course

of treatment shows that she demonstrated attentiveness and responsiveness in her care for

Schlueter's heart-related issues.  *See, e.g.*, *Lloyd v. Moats*, 721 F. App'x 490, 494 (7th Cir. 2017)

(finding no deliberate indifference where defendants' treatment "reflect[ed] a level of continuous

care that is not consistent with a malicious state of mind"); *Pyles*, 771 F.3d at 412 (finding no

deliberate indifference where the defendant prescribed new medications or changed the dosages

in response to the prisoner's complaints that the medications were not helping); *McGee v.

Adams*, 721 F.3d 474, 481–82 (7th Cir. 2013) (finding that the defendants' "meaningful and

ongoing assessment of a patient's condition [was] the antithesis of 'deliberate indifference'").

 Nonetheless, Schlueter contends that February 2020 printouts of entries in the

Prescriber's Digital Reference ("PDR") show that PA Valdez knew better than to prescribe him

beta blockers.  According to these entries, prescribing beta blockers to patients with severe

bradycardia or sick sinus syndrome is contraindicated unless the patient also has a functioning

pacemaker (which Schlueter did not have when PA Valdez treated him). Doc. 198 at 5–7 (Supplemental Statement of Facts ("SSOF") Nos. 2, 6, 10).

These PDR entries, however, do not create a genuine dispute of material fact for several reasons. First, the PDR entries only show, at best, recommended practices as of February 2020. PA Valdez, however, prescribed beta blockers to Schlueter several years earlier, from March 2011 through April 2012. The PDR entries do not provide any evidence regarding the standards or practices for prescribing beta blockers in 2011 or 2012, and Schlueter does not identify any other evidence from which a jury could link the content of the February 2020 PDR entries to the accepted professional standards or practices during the relevant timeframe. Second, the PDR entries address, in relevant part, the prescription of beta blockers to patients with *severe* bradycardia or sick sinus syndrome. But there is no evidence in the record that Schlueter's treaters (including PA Valdez) considered his bradycardia to be severe, and the first time any medical professional identified sick sinus syndrome as a possible diagnosis was in October 2012, well after PA Valdez had stopped treating Schlueter. So, even if the PDR entries did shed light on recommended practices in 2011 and 2012, there would be no reason for PA Valdez to believe that they prohibited treating Schlueter with beta blockers. Third, even if the Court assumes that a reasonable jury could find that the PDR entries represented recommended practices in 2011 and 2012 *and* contradicted PA Valdez's treatment decisions, there is no evidence in the record that prescribing a medication in a manner that contradicts the PDR is "so far afield of accepted professional standards as to raise the inference that" such a decision "was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396.

Schlueter also asserts that testimony from other doctors shows that "beta-blockers should not have been prescribed to" him. Doc. 198 at 15. In particular, Dr. Avitall testified that he

would not have prescribed beta blockers to Schlueter; Dr. Kondos testified that if a patient were to complain of excessive fatigue and continuing symptoms, he would not recommend Nadolol and that he would take the patient off Nadolol if the patient was already taking it; and Dr. Ardati testified that the evidence for using beta blockers to treat vasovagal symptoms is not great and that beta blockers slow the heart rate. But even if the Court interprets this testimony as reflecting the doctors' disagreement with the course of treatment PA Valdez pursued, "evidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out" a claim for deliberate indifference. *Petties*, 836 F.3d at 729 (emphasis in original). That Drs. Avitall, Kondos, and Ardati may not have prescribed beta blockers to Schlueter only suggests a difference of opinion among medical professionals as to how to treat Schlueter. This is insufficient to "support a finding of deliberate indifference." *Norfleet*, 439 F.3d at 396; *see also Murphy v. Wexford Health Sources Inc.*, 962 F.3d 911, 916–17 (7th Cir. 2020) (expert testimony that the defendant's steroid treatment was inappropriate and deviated from the standard of care merely "highlight[ed] a difference in medical opinion over the course of treatment[,]" which suggested "negligence rather than deliberate indifference").

Ultimately, there is insufficient evidence in the record upon which a reasonable jury could rely to find that "no minimally competent professional" would have responded the way PA Valdez did in the circumstances she faced. *Wilson*, 932 F.3d at 519 (citation omitted). Nor is this a case where PA Valdez's decision to treat Schlueter with beta blockers was so obviously wrong that a jury could infer deliberate indifference without evidence regarding the accepted medical standards or practices in 2011 and 2012. *See Whiting*, 839 F.3d at 663 (implicitly recognizing that a medical decision can be "so obviously wrong that a layperson could draw the required inference about the doctor's state of mind without expert testimony"); *Petties*, 836 F.3d

at 729 ("If a risk from a particular course of medical treatment (or lack thereof) is obvious

enough, a factfinder can infer that a prison official knew about it and disregarded it.").  The

Court grants summary judgment in PA Valdez's favor on Schlueter's current health claim.

### 2.     Dr. Wahl and Dr. Funk

Although Defendants specifically argued that summary judgment is appropriate for both

Dr. Wahl and Dr. Funk, Schlueter's summary judgment response does not particularly discuss

Dr. Wahl's and Dr. Funk's course of treatment.  Nor does it attempt to explain how these

doctors' treatment decisions amount to deliberate indifference.  In fact, Schlueter's response

mentions Dr. Wahl a single time, and Dr. Funk not at all.  Summary judgment was the time for

Schlueter to demonstrate why a reasonable jury could find that Dr. Wahl and Dr. Funk were

deliberately indifferent to his medical needs.  *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th

Cir. 2010) ("Summary judgment is the 'put up or shut up' moment in a lawsuit." (citation

omitted)); *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir.

1996) ("A party seeking to defeat a motion for summary judgment is required to 'wheel out all

its artillery to defeat it.'" (citation omitted)).  Schlueter's failure to devote particularized

attention to Dr. Wahl's and Dr. Funk's treatment decisions runs counter to a finding that his

deliberate indifference claims against these physicians should go to a jury.

Even so, Schlueter's theory of liability against Dr. Wahl and Dr. Funk appears to be

based on their failure to discontinue his Nadalol prescription when they saw him in April 2012

and July 2012, respectively.  *See, e.g.*, Doc. 198 at 4 ("Other Defendant doctors were aware Mr.

Schlueter had been prescribed a beta-blocker and continued the prescription despite his medical

condition."); *id.* at 15 ("Defendants are therefore liable to Mr. Schlueter because they . . . failed

to take him off the beta-blocker he was already improperly prescribed.").  Schlueter presumably

contends that the same evidence that demonstrates PA Valdez's deliberate indifference in prescribing beta blockers, including Nadolol, demonstrates Dr. Wahl's and Dr. Funk's deliberate indifference in *not* discontinuing Schlueter's Nadolol prescription.

But just as this evidence is insufficient for a reasonable jury to find that prescribing Nadolol constituted deliberate indifference in the first place, it is insufficient for a reasonable jury to find that the failure to discontinue this prescription amounted to deliberate indifference. As already discussed, the February 2020 PDR printouts do not provide any evidence from which a jury could find that prescribing beta blockers to Schlueter constituted deliberate indifference, and the fact that some doctors may have discontinued Nadolol merely shows a difference of opinion that does not suggest deliberate indifference either. *See Murphy*, 962 F.3d at 916–17; *Norfleet*, 439 F.3d at 396.  In addition, Dr. Wahl and Dr. Funk were not the only doctors who failed to discontinue Schlueter's Nadolol prescription.  Schlueter's doctors at UIC—Dr. Kondos, Dr. Ardati, and Dr. Avitall—all knew at some point that he was taking Nadolol, and yet none of them discontinued the medication (Dr. Smith, a doctor at Dixon, discontinued Schlueter's Nadolol prescription in February 2013 after his pacemaker implantation).  The fact that several specialists also declined to take Schlueter off Nadolol shows that this decision was not one that "*no* minimally competent professional" would have made.  *Wilson*, 932 F.3d at 519 (emphasis added) (citation omitted).  Schlueter simply has not identified any evidence from which a reasonable jury could find that Dr. Wahl's and Dr. Funk's failure to discontinue Schlueter's Nadolol prescription was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."  *Norfleet*, 439 F.3d at 396.

What is more, Dr. Funk sought (and obtained) approval for Schlueter to see a specialist for further treatment of his syncopal episodes.  This is not the type of medical response that

reflects deliberate indifference. *See Shields*, 746 F.3d at 796 (referring an inmate to a doctor who would be able to competently treat the inmate's injury constituted adequate care); *cf. Pyles*, 771 F.3d at 411–12 (explaining that a *failure* to refer an inmate to a specialist cannot support a deliberate indifference claim unless it is "blatantly inappropriate"). And Dr. Wahl testified that she used professional judgment at all times in treating Schlueter. Because Schlueter does not have any evidence to the contrary, this testimony also shows the appropriateness of judgment in Dr. Wahl's favor. *See Zaya*, 836 F.3d at 805 ("A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment."). Accordingly, the Court grants summary judgment for Dr. Wahl and Dr. Funk on Schlueter's current health claims.

### 3. Dr. Dominguez

Schlueter's current health claim against Dr. Dominguez is based on her December 2011 decision to discontinue Schlueter's Lopressor prescription, which was 50 mg once per evening. As the parties agree, Dr. Dominguez discontinued this medication "because she was concerned that [Schlueter's] syncopal episodes were related to his bradycardia, and [she] wanted to see if there was an improvement or change in his symptoms." Doc. 197 at 16 (USOF No. 56). According to Schlueter, however, Dr. Dominguez erred by taking him off Lopressor "cold turkey, rather than gradually as is proper." Doc. 198 at 15.

Whether to wean a patient off medication or to discontinue the medication all at once is "a classic example of a matter for medical judgment." *Pyles*, 771 F.3d at 411 (citation omitted). As such, it leads to liability only if it is "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet*, 439 F.3d at

32

396. Like the treatment decisions of PA Valdez, Dr. Wahl, and Dr. Funk, the Court must defer to Dr. Dominguez's decision unless "no minimally competent professional would have so responded under those circumstances." *Wilson*, 932 F.3d at 519 (citation omitted).

The only support for Schlueter's claim against Dr. Dominguez is a February 2020 printout of the PDR entry for Lopressor Tablets, which states that adverse effects may result from abruptly discontinuing metoprolol (the generic name for Lopressor) and that "it is prudent to taper the dosage of metoprolol" "[e]ven in patients without overt coronary artery disease[.]" Doc. 198 at 6, 15. But as already discussed, Schlueter's PDR printouts show, at most, recommended practices as of February 2020. Dr. Dominguez discontinued Schlueter's Lopressor in December 2011, more than eight years earlier. Schlueter does not provide any evidence that would allow a reasonable jury to conclude that the PDR entry reflects a standard or practice for discontinuing Lopressor at the time Dr. Dominguez made the challenged medical decision. There also is no evidence in the record that discontinuing a medication in a manner that contradicts the PDR is "so far afield of accepted professional standards as to raise the inference that" such a decision "was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396. Furthermore, Dr. Dominguez's decision to discontinue a low dose of medication all at once instead of gradually decreasing it is not one that is so obviously wrong that a jury could find deliberate indifference without evidence regarding the acceptable standards and practices in 2011 for discontinuing low dosages of beta blockers. *See Whiting*, 839 F.3d at 663; *Petties*, 836 F.3d at 729. Because no reasonable jury could find that Dr. Dominguez was deliberately indifferent in discontinuing Schlueter's low dosage of Lopressor all at once, the Court grants summary judgment in Dr. Dominguez's favor on Schlueter's current health claim.

## B.   Future Health Claims

Schlueter's future health claims center on the implantation of his pacemaker. Specifically, he contends that his doctors erred in implanting a pacemaker and, as a result of this erroneous decision, he "will need to receive on-going physical evaluations by specialists, may need to undergo repeated surgeries, [and] runs the risk of infection and/or other risks associated with the malfunction of a mechanical device implanted in his body." Doc. 55 ¶ 70; Doc. 198 at 4, 15–17.[17]

To demonstrate deliberate indifference to future health, a plaintiff must prove (1) that the defendant "exposed him to an 'unreasonable risk of serious damage to his future health,'" and (2) that the defendant "knew of and disregarded an excessive risk to inmate health or safety." *Vidlak v. Cox*, 786 F. App'x 62, 63–64 (7th Cir. 2019) (alterations omitted) (citations omitted). "To withstand summary judgment on this type of claim, an inmate must show 'to a degree of reasonable medical certainty' that he actually faced an increased risk of injury." *Byrd v. Hobart*, 761 F. App'x 621, 624 (7th Cir. 2019) (citations omitted).

At bottom, though, any § 1983 claim requires a plaintiff to show that an individual defendant was *personally responsible* for the alleged constitutional violation. *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017); *Shields*, 746 F.3d at 797 ("[Section] 1983 requires proof of individual responsibility."). Indeed, to succeed on a future health claim, the prisoner must prove that the defendant's wrongful conduct proximately caused the increased risk. *Henderson v.*

---

[17] Schlueter also alleges in the operative complaint that he was last examined by a cardiologist in February 2015 and that he has not received "the appropriate follow-up examinations and care applicable to patients with inserted pacemaker devices[.]" Doc. 55 ¶ 66. However, in responding to Defendants' summary judgment motion, Schlueter does not contend that the Individual Defendants were deliberately indifferent to his future health by failing to refer him to a cardiologist for follow-up examinations after February 2015. Thus, the Court does not consider any such contention. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("[A] party waives an argument by failing to make it before the district court.").

*Sheahan*, 196 F.3d 839, 851 (7th Cir. 1999). Here, though, the decision to implant the pacemaker and the other pacemaker-related decisions of which Schlueter complains were *not* made by the Individual Defendants. After Dr. Kondos first identified a pacemaker as a possibility in October 2012, Dr. Avitall recommended that Schlueter receive a pacemaker, and Schlueter agreed with this recommendation. Based on Dr. Avitall's recommendation, Dr. Smith obtained approval from Wexford for the pacemaker implantation. Dr. Avitall then performed the implantation in February 2013. Later, in 2018, Dr. Lazar declined to remove Schlueter's pacemaker despite Schlueter's repeated requests for removal. Not one of these doctors is a defendant in this lawsuit.

Furthermore, the pacemaker-related decisions the Individual Defendants did make confirm that no reasonable jury could find that they were deliberately indifferent to Schlueter's future health needs. At the outset, PA Valdez and Dr. Funk did not make any treatment decisions regarding Schlueter's pacemaker; they last treated Schlueter in April 2012 and July 2012, respectively, which was well before the prospect of a pacemaker even came into the picture. Dr. Wahl and Dr. Dominguez treated Schlueter after he underwent his pacemaker implantation, but their treatment decisions and actions demonstrate attentiveness, not indifference, to Schlueter's pacemaker. At her January 2014 visit with Schlueter, Dr. Wahl noted that there were no issues with the pacemaker and that Schlueter was recommended to return to the pacemaker clinic in six months. Less than six months later, in June 2014, she sought and obtained approval for Schlueter to go to UIC for another check of his pacemaker. Then, upon Schlueter's return from his visit to UIC, Dr. Wahl planned to request another six-month follow-up appointment in line with the cardiologist's recommendation. Approximately six months later, Schlueter returned to UIC for a follow-up appointment, presumably pursuant to

Dr. Wahl's plan. As for Dr. Dominguez, she referred Schlueter to UIC for a follow-up appointment after he complained of swelling over the site of the pacemaker in February 2013; ordered a chest x-ray, lab tests, and a referral to UIC for follow up regarding his pacemaker after he presented complaining of chest pain and syncopal symptoms in April 2014; ordered lab tests and a follow-up appointment in four weeks after Schlueter presented complaining of a nighttime racing heartbeat in July 2015; and planned to refer Schlueter to UIC's cardiology department again after he presented in September 2015 with an increased heart rate and complaints of numbness and tingling in his hand, fingers, and arm.

In short, the Individual Defendants were not personally responsible for the allegedly improper pacemaker-related decisions that underlie Schlueter's future health claims, and no reasonable jury could find that any post-pacemaker treatment provided by the Individual Defendants was deliberately indifferent. Thus, the Court grants summary judgment in the Individual Defendants' favor on Schlueter's future health claims.

## III. *Monell* Claim Against Wexford

Finally, Schlueter contends that Wexford maintains a policy, procedure, or practice whereby it intentionally delays or refuses to provide adequate medical care to inmates. According to Schlueter, Wexford provides "an insufficient number of staff to adequately treat inmate patients' health conditions," and the employees that do treat the patients commonly or routinely (1) fail or refuse to "properly examine inmate patients with serious medical conditions" and (2) ignore and refuse to "respond to inmate patients' concerns and questions." Doc. 55 ¶¶ 71–72. Schlueter further claims that Wexford's "unconstitutional policies, procedures[,] and practices" have deprived him of "his constitutional right to receive appropriate medical care,"

36

have forced him "to endure years of unnecessary and unreasonable pain and suffering," and will force him "to endure the same in the future." *Id.* ¶ 74.

To prove a *Monell* claim against Wexford, Schlueter must show that Wexford "maintained an unconstitutional policy or custom" that caused "the injury that is the basis of [his] § 1983 claim." *Gabb*, 945 F.3d at 1035 (citation omitted). Notably, the parties do not submit a single statement of fact that purports to address Wexford's policies or customs. Rather, in responding to Defendants' summary judgment motion, Schlueter only identifies facts that illustrate his own treatment experiences. Generally, this is not enough to demonstrate a policy or custom under *Monell*. *Estate of Perry v. Wenzel*, 872 F.3d 439, 461 (7th Cir. 2017) ("[I]t is also well-established that Perry must do more than simply rely upon his own experience to invoke *Monell* liability."); *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016) ("To prove an official policy, custom, or practice within the meaning of *Monell*, Daniel must show more than the deficiencies specific to his own experience, of course."). Although it is not impossible "to demonstrate a widespread practice or custom with evidence limited to personal experience," a plaintiff can only do so by showing that the incidents he experienced demonstrate "a true municipal policy." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (citation omitted). Here, though, Schlueter makes no attempt to explain how his experiences "satisfy the 'more difficult' task of proving a custom with only evidence of personal experience." *Id.* at 427 (citation omitted).

Moreover, even if Schlueter's personal experiences were evidence of a Wexford policy or custom, no reasonable jury could find that these experiences reflect a policy or custom that violated Schlueter's constitutional rights. *See King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007) ("It is well established that there can be no municipal liability

based on an official policy under *Monell* if the policy did not result in a violation of [the plaintiff's] constitutional rights.").  First, Schlueter points to the Individual Defendants' failure to consult Dr. Robinson, fully examine Schlueter, or research the appropriateness of beta blockers before prescribing such medication (or, in the case of Dr. Wahl and Dr. Funk, failing to discontinue this medication).  As already discussed, though, no reasonable jury could find that the Individual Defendants' treatment decisions show deliberate indifference; therefore, these decisions similarly cannot reflect a Wexford policy or custom of deliberate indifference. Second, Schlueter asserts that "Wexford's employees failed to promptly recognize the improper nature of [the beta blocker] prescription and disregarded the fact that the treatment was not improving Mr. Schlueter's condition but was in fact causing adverse side effects."  Doc. 198 at 18.  This assertion is not supported by the record, however.  To the contrary, PA Valdez switched Schlueter's Propranolol prescription to Lopressor after he reported side effects, and Schlueter reported improvement (at least initially) after taking Lopressor and Nadolol.  In fact, Schlueter even asked PA Valdez to put him back on Lopressor after Dr. Dominguez discontinued the prescription.  Third, Schlueter blames Wexford's employees for implanting a pacemaker without exhausting other available treatments.  But it was the doctors at UIC that recommended (and implanted) Schlueter's pacemaker, so it is unclear how these decisions demonstrate a *Wexford* policy or custom.  True, Wexford approved the pacemaker implantation, but Schlueter does not explain, nor does the Court see, how a reasonable jury could find that Wexford's willingness to approve a specialist's recommended course of treatment reflects a policy of providing inadequate care to inmates.

Schlueter may believe that Wexford's medical professionals should have done certain things differently in treating him, but Wexford was not required to have its employees give

Schlueter the specific care he wanted, or even "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, Wexford only had to provide Schlueter with "adequate medical care." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). And here, Wexford's medical professionals saw Schlueter more than 30 times from January 2010 through September 2015. They referred Schlueter to UIC for more specialized care on numerous occasions, and there is no evidence that Wexford ever once denied any of these referrals. Indeed, by the Court's count, Schlueter saw specialists at least twelve times during this time span. Wexford's medical professionals also repeatedly followed the recommendations (or what they believed to be the recommendations) of these specialists. Nothing about this course of treatment suggests a policy or custom of medical treatment so inadequate that it constitutes deliberate indifference to Schlueter's or any other prisoner's medical needs. *See McGee*, 721 F.3d at 481–82 (finding that the defendants' "meaningful and ongoing assessment of a patient's condition [was] the antithesis of 'deliberate indifference'"). The Court therefore grants summary judgment in Wexford's favor on Schlueter's *Monell* claim.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [195]. The Court enters judgment on Schlueter's operative complaint [55] in Defendants' favor and terminates this case.

Dated: August 25, 2020

_____
SARA L. ELLIS
United States District Judge

39